UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

RHONDA MOORE,

                    Plaintiff,

          v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.

_____

**DECISION AND ORDER**

6:15-cv-06281 EAW

## I.   Introduction

Represented by counsel, Plaintiff Rhonda Moore ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying Plaintiff's application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). (Dkt. 1). Presently before the Court are the parties' opposing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 11; Dkt. 13). For the reasons set forth below, the Commissioner's motion is denied, Plaintiff's motion is granted in part, and this matter is remanded for further administrative proceedings.

## II.   Factual Background and Procedural History

### A.   Overview

On April 28, 2011, Plaintiff filed an application for SSI and DIB (Administrative Transcript (hereinafter "Tr.") at 171-77, 214-22). In her application, Plaintiff alleged that

she had been disabled since January 1, 2011, due to anxiety, mental health issues, and migraines. (Tr. 171, 215). Plaintiff's application was initially denied on December 8, 2011. (Tr. 58-68). Plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 69-70). Plaintiff appeared at a hearing before Administrative Law Judge ("ALJ") Stanley K. Chin on September 17, 2013. (Tr. 33-52). Vocational Expert ("VE") Bassey A. Duke also testified at the hearing. (Tr. 52-57). On November 14, 2013, ALJ Chin issued a decision finding Plaintiff not disabled. (Tr. 15-27). The Appeals Council denied Plaintiff's request for review on March 11, 2015, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-4). Plaintiff commenced this action on May 11, 2015. (Dkt. 1).

**B.    The Non-Medical Evidence**

Plaintiff was 34 years old on the date of the ALJ's decision. (Tr. 171). She testified that she was employed part-time doing teleradiology from home. (Tr. 38-39). Plaintiff described her work as providing quality assurance regarding radiology scans before they are delivered to emergency rooms. (*Id.*). Plaintiff testified that she worked "four to five hours like three times out of the week" and that she was paid $18 per hour. (Tr. 39). Plaintiff further testified that she had previously been employed by AIDS Care of Rochester from October 2012 to May 2013, during which she performed medical billing 37.5 hours per week and was paid $15 per hour. (Tr. 39-40). Plaintiff told the ALJ that prior to her employment with AIDS Care of Rochester, she was self-employed as a contractor for Advanced Radiology, that she worked there for eight months, a total of nine hours per week, and that she was paid $10 per hour. (Tr. 40).

Plaintiff testified that she had no history of drug or alcohol abuse. (Tr. 40-41). She further testified that she had driven to the hearing, but that it had taken her about 20 minutes to do so because of her anxiety. (Tr. 41).

Plaintiff told the ALJ that she was 5'4" and weighed 130 pounds, having gained weight after the birth of her 2-year-old son. (Tr. 41). Plaintiff testified that she lived with her son and that her mother performed the majority of the cooking and the cleaning and also ensured that her child was fed. (Tr. 41-42). Plaintiff stated that she was able to dress and bathe herself, but that she sometimes did not feel like bathing and so she would not. (Tr. 42). Plaintiff told the ALJ that she did not like to leave her house during the daytime, did not allow anyone in her home, and did not have any friends. (*Id.*). According to Plaintiff, she typically spent her days watching television or lying in bed, either crying or sleeping. (*Id.*).

Plaintiff told the ALJ that she suffered from panic attacks. (Tr. 43). She reported having fears that people were discussing her behind her back, and that she could become preoccupied thinking about her loved ones or co-workers passing away. (*Id.*). Plaintiff stated that her panic attacks impaired her ability to concentrate. (*Id.*). She also stated that she would have migraines as a result of anxiety. (*Id.*). Plaintiff testified that she did not like interacting with others and that it was difficult for her to be part of a team. (*Id.*).

Plaintiff told the ALJ that she was being treated by psychiatrist Dr. Frederick Remington. (Tr. 44). Plaintiff reported that Dr. Remington prescribed medication. (*Id.*). Plaintiff said that she had seen a therapist in the past but that she did not feel it was helpful. (*Id.*). Plaintiff stated that she had not seen any improvement in her condition as

- 3 -

a result of treatment.  (*Id.*).  Plaintiff also stated that she suffered from side effects from her medication, including dizziness and tiredness.  (*Id.*).  Plaintiff testified that she sometimes had "mood swings" that made her not want to take her medication.  (Tr. 44-45).

Upon questioning from her attorney, Plaintiff testified that she had "scoliosis" that made it difficult for her to sit in a chair for more than 20 minutes.  (Tr. 45).  She stated that she could not sit still and frequently needed to get up and move.  (*Id.*).  Plaintiff also testified that her hands would shake due to nervousness and that her legs "are always hurting."  (*Id.*).  Plaintiff claimed to be unable to walk in a straight line.  (Tr. 45-46).

Plaintiff also told the ALJ that she suffered from migraines.  (Tr. 46).  According to Plaintiff, she would experience migraines up to five times per week.  (*Id.*).  Plaintiff testified that she took Excedrin for less serious migraines and an Imitrex injection for more serious migraines.  (*Id.*).  She estimated that she took an Imitrex injection three times per week.  (*Id.*).  Plaintiff stated that if the medication did not work, which it sometimes did not, the migraine would last up to 10 hours.  (Tr. 46-47).  Plaintiff testified that her mother assisted her with childcare when Plaintiff was suffering from a migraine. (Tr. 47).

### C.   Vocational Expert's Testimony

VE Duke also testified during the hearing.  (Tr. 52-56).  The VE first summarized Plaintiff's prior work experience, reviewing the strength and the skill level required to perform each job.  (Tr. 53).  Plaintiff had worked as a medical billing clerk, a skilled, sedentary job; in radiology, a skilled job which requires the ability to lift light objects; as

an account manager, a skilled, sedentary job; as a customer service director, a semi-skilled job which requires the ability to lift light objects; an outbound call center supervisor, a skilled, sedentary job; and as an insurance verification manager, a skilled, sedentary job. (*Id.*).

The ALJ asked the VE to comment on two hypothetical situations. In the first, the ALJ proposed a hypothetical person limited to doing simple routine tasks "in a work environment free of fast-paced production requirements," with no public interaction, occasional supervision, and who was responsible for only simple work-related decisions. (Tr. 54). The hypothetical person would also be limited to lifting loads of 50 pounds occasionally, and 25 pounds frequently; be able to stand and walk, or, alternatively, sit for up to six hours in an eight-hour workday; frequently negotiate ramps and stairs, and frequently balance, stoop, kneel, crouch, and crawl. (*Id.*). The ALJ asked if such a person would be able to perform Plaintiff's prior jobs. (*Id.*). The VE testified that a person with these limitations would not be able to perform Plaintiff's prior jobs. (*Id.*).

The VE stated, however, that there were jobs in significant numbers in the local and national economies that could be performed with such limitations, and for which Plaintiff would be qualified given her experience, education, and language skills. (*Id.*). A hypothetical person with Plaintiff's limitations and experience could find work as a hand packager (300,000 jobs nationally; 5,000 in New York state); a receiving checker (400,000 jobs nationally; 5,000 in New York state); or an assembler (100,000 jobs nationally; 1,000 in New York state). (Tr. 54-55).

In the second hypothetical, the ALJ asked the VE whether someone with the previously stated limitations, having the same age, education,[1] and experience as Plaintiff, could perform Plaintiff's past work if they were off task twenty percent of the time. (Tr. 55). The VE testified that such a person would not be able to work in Plaintiff's previous jobs, nor are there any other jobs in the national economy for such a person. (*Id.*).

### D.    Summary of the Medical Evidence

Medical evidence illuminates three separate categories of health-related issues suffered by Plaintiff. First, Plaintiff has a history of treatment and medication for mental health issues including chronic depression and anxiety. Second, Plaintiff's records show treatment for migraine headaches. Finally, Plaintiff's medical evidence shows chronic lower back and abdominal pain of an unknown origin that may be related to a claimed January 2011 automobile collision. (*See* Tr. 495).

### 1.    Medical Records Before Alleged Onset Date

Plaintiff's medical records show a history of mental health-related issues and treatment, both before and after her alleged onset date. On February 11, 2009, Plaintiff reported to Clifford Jacobson, M.D. at Vanguard Psychiatric Services complaining of anxiety, sleeplessness, and mood swings. (Tr. 742). She had previously been treated at

---

[1]    The record is not entirely clear as to Plaintiff's level of education. During her hearing, Plaintiff's attorney stated that Plaintiff has only a seventh grade education. (Tr. 37). The ALJ's Decision states that Plaintiff has a high school education, as does Plaintiff's Disability Report. (Tr. 26, 216). A consultative psychiatric evaluator stated that Plaintiff had completed one year of college. (Tr. 512.) A mental health provider stated that Plaintiff had a bachelor's degree. (Tr. 260).

Rochester Mental Health in 2001 and was diagnosed with generalized anxiety disorder and depression. (Tr. 277-279). Plaintiff continued treatment with Dr. Jacobson on February 28, 2009, April 14, 2009, May 15, 2009, July 16, 2009, August, 17, 2009, September 14, 2009, October 9, 2009, October 27, 2009, January 27, 2010, March 16, 2010, April 19, 2010, August 5, 2010, August 30, 2010, September 27, 2010, November 4, 2010, and November 29, 2010. (Tr. 743-754). She was diagnosed with generalized anxiety disorder, panic disorder with agoraphobia, and depressive disorder. (Tr. 745).

Plaintiff underwent an intake evaluation for anxiety performed by Dr. Fredrick Remington on February 18, 2009. (Tr. 294). She was diagnosed with generalized anxiety disorder and panic disorder with agoraphobia. (Tr. 296). Plaintiff continued care with Dr. Remington on August 20, 2009, September 10, 2009, October, 7, 2009, October 27, 2009, January 5, 2010, January 28, 2010, February 23, 2010, May 6, 2010, and November 30, 2010. (Tr. 297-301).

### 2.   Mental Health Records After Alleged Onset Date

Plaintiff continued treatment for mental-health related issues after her alleged onset date of January 1, 2011. Plaintiff's medical records show Plaintiff contacted Dr. Remington on February 1, 2011 and reported she was pregnant. (Tr. 297). She was directed to her OB/GYN to determine which mental health medications were safe during her pregnancy. (*Id.*). At some point during her pregnancy, Plaintiff ceased taking prescribed mental health medication. (*See* Tr. 367).

It appears Plaintiff was treated at Strong Health for mental health treatment from January 2011 to July 2011. (Tr. 478-87). The notes are largely illegible, and it is unclear

who provided treatment.   (*See id.*)   Associated diagnoses or prescribed courses of treatment are similarly unclear.  (*See id.*)

On May 2, 2011, Plaintiff saw Kim Linde, M.S., at the University of Rochester Medical Center for extreme depression, anxiety, and panic attacks.  (Tr. 260).  Plaintiff was in her seventh month of pregnancy.   (*Id.*).   Linde reported: constricted affect; depressed and anxious mood; fair concentration; impaired recent memory; minimal judgment; fair impulse control; and fair/poor insight.  (Tr. 262).   Plaintiff referenced "hearing and seeing some unusual things during her pregnancy." (*Id.*).  Linde assessed Plaintiff to have a Global Assessment of Functioning ("GAF") score of 48.[2]  (Tr. 264). Linde diagnosed Plaintiff with mood disorder, major depressive disorder, bipolar disorder, and generalized anxiety disorder, and proposed treatment with individual psychotherapy.  (Tr. 264).   Linde noted similar symptoms during therapy with Plaintiff on May 16, 2011, May 25, 2011, June 1, 2011, June 13, 2011, June 24, 2011, and July 11, 2011.  (Tr. 265-74, 366-67).

On July 11, 2011, Linde indicated that Plaintiff could benefit from resuming medications after the birth of her child.  (Tr. 367).  A behavioral health treatment plan

---

[2]   A GAF score serves "as a global reference intended to aid in treatment, . . . [but] does not itself necessarily reveal a particular type of limitation and is not an assessment of a claimant's ability to work." *Camille v. Colvin*, 104 F. Supp. 3d 329, 342 (W.D.N.Y. 2015).  A GAF score of 41-50 indicates serious symptoms or impairment of social or occupational functioning.  Am. Psych. Ass'n, Diagnostic and Statistical Manual of Mental Disorders–Text Revision, at 34 (4th ed., rev. 2000); *see, e.g.*, *Windom v. Colvin*, No. 6:14-CV-06652, 2015 WL 8784608, at *2 (W.D.N.Y. Dec. 15, 2015) (stating that a GAF score of 47 indicated "serious symptoms (such as suicidal ideation) or a serious impairment in social or occupational functioning").

dated August 1, 2011, indicated Plaintiff was diagnosed with mood disorder and there was a need to "rule out" major depressive disorder severe with psychotic features, bipolar disorder most recent episode depressed with psychotic features, and generalized anxiety disorder. (Tr. 368). Plaintiff was involved in the development of the treatment plan and agreed with its contents. (Tr. 370).

On August 3, 2011, Plaintiff returned to Dr. Jacobson for an evaluation of her psychiatric symptoms. (Tr. 754). She was diagnosed with generalized anxiety disorder, panic disorder with agoraphobia, depressive disorder, a possible eating disorder, and migraines. (Tr. 755). Plaintiff was prescribed Remeron and Valium. (*Id.*).

On August 10, 2011, Plaintiff met with Roma Fortuna-Dwulit, M.D., for a psychopharmacology evaluation. (Tr. 281-83). Plaintiff was diagnosed with depression, generalized anxiety disorder, and "rule out" panic disorder, bipolar disorder, impulse control disorder, and PTSD. (Tr. 283). Dr. Fortuna-Dwulit prescribed Mirtazapine and Diazepam. (Tr. 283).

On August 10, 2011, Plaintiff returned to therapy with Linde, following the birth of her child. (Tr. 284-285). She continued to have a lack of appetite and poor sleep, which were issues present before and during her pregnancy. (Tr. 285). Mental status exam revealed: mildly depressed mood; congruent affect; fair/poor concentration; minimal judgment; fair impulse control; fair/poor insight. (Tr. 284-85). Plaintiff exhibited similar signs during a mental status exam on August 30, 2011. (Tr. 286-87).

On September 2, 2011, Plaintiff reported to Nurse Practitioner Patricia Mangarelli and complained of poor appetite, weight loss, insomnia, and fair enjoyment/interest. (Tr.

288). Plaintiff reported side effects from Remeron causing her issues caring for her child. (*Id.*). A mental status exam revealed fair concentration, insight, judgment, and impulse control. Mangarelli prescribed Zoloft and Vistaril for anxiety. (Tr. 289).

Plaintiff continued therapy with Linde on October 24, 2011. Plaintiff had taken an ambulance to the emergency room the week before for what was later determined to be a panic attack. (Tr. 291). Linde indicated Plaintiff had "drifted away" from therapy. (*Id.*). Plaintiff was reluctant to return to Mangarelli because she did not feel they were compatible, and Linde recommended contacting her primary care physician to manage Plaintiff's medications. (*Id.*). Linde recommended continued therapy. (*Id.*). Plaintiff met with Linde again on January 17, 2012. (Tr. 385-86).

Plaintiff was discharged from the University of Rochester Strong Family Therapy Services on March 27, 2012, with a diagnosis of mood disorder, generalized anxiety disorder, and "rule out" major depressive disorder recurrent, severe with psychotic features. (Tr. 390). In total, Plaintiff had attended eleven therapy appointments and two psychopharmacology appointments. (Tr. 390). Her symptoms were only slightly improved. (Tr. 390).

Plaintiff received a Suboxone induction from Dr. Clifford J. Hurley on January 17, 2012. (Tr. 534.) The induction was an attempt to end Plaintiff's need for Percocet, which was prescribed after the birth of her child. (*Id.*). Plaintiff had received a similar treatment three years prior, beginning in January 2008.[3] (*Id.*). By February 2009,

---

[3]     Plaintiff was treated by Dr. Hurley with Suboxone for addiction on January 11, 2008, February 1, 2008, February 21, 2008, February 26, 2008, March 17, 2008, April

Plaintiff had weaned herself off Suboxone, and had completed drug court and outpatient treatment programs. (Tr. 532).

Plaintiff stated during the January 17, 2012 treatment with Dr. Hurley that she had been prescribed Percocet after giving birth, and she was taking it "more and more." (*Id.*). In addition to Suboxone, Plaintiff was prescribed Baclofen and Clonidine. (Tr. 535). Plaintiff continued care with Dr. Hurley on January 18, 2012. (Tr. 536). On January 28, 2012, Dr. Hurley indicated Plaintiff had not been honest about other medications that had been prescribed, had failed to show for two appointments, and had re-started using Percocet. (Tr. 538-39). Plaintiff's urine tests were positive for opiates. (Tr. 538).

On February 1, 2012, Plaintiff again met with Dr. Hurley. (Tr. 540). Plaintiff noted that she was having issues with anxiety and depression. (*Id.*). Dr. Hurley spent "a lot of time" talking with Plaintiff about depression and anxiety, and how her psychotropic medication worked, including that she needed to be on them for several weeks for them to take effect. (Tr. 541). Dr. Hurley stated Plaintiff "is having mental health issues . . . ." (Tr. 542). He encouraged her to take her prescribed medications, including Vistaril, Remeron, and Zoloft. (Tr. 541).

On October 12, 2012 Plaintiff reported to Darren Houpt, M.D., at Lifetime Health Medical Group complaining of anxiety, depressed mood, and hallucinations or manic episodes. (Tr. 639). She was diagnosed with chronic depression, and was prescribed Ambien, Promethazine, and Imitrex. (Tr. 639, 641). On October 31, 2012, she followed

---

14, 2008, May 12, 2008, June 16, 2008, September 10, 2008, October 7, 2008, November 5, 2008, December 1, 2008, February 10, 2009, and March 6, 2009. (Tr. 520-33).

up with Dr. Houpt, and exhibited similar signs of anxiety and depression. (*See* Tr. 639, 645). Dr. Houpt prescribed Effexor. (Tr. 647).

On May 15, 2013, Plaintiff reported to Zhong Guo, M.D., at Lifetime Health for anxiety. (Tr. 675). Plaintiff's anxiety had worsened in the prior weeks, and she had been terminated by her job. (*Id.*). Dr. Guo assessed her with recurrent anxiety and prescribed sertraline. (Tr. 677).

Plaintiff returned to treatment with Dr. Remington on May 22, 2013, after a two year absence. (Tr. 710). Dr. Remington stated Plaintiff was "clearly chronically depressed and anxious," and renewed her medications. (*Id.*).

On May 23, 2013, Plaintiff's pharmacy informed Dr. Guo that Plaintiff had already filled Dr. Remington's Ambien prescription and that Plaintiff had "ask[ed] them to not contact her [primary care provider]." (Tr. 682). On June 2, 2013, Dr. Guo adjusted Plaintiff's Ambien prescription at Plaintiff's request, noting that Dr. Remington had been made aware that Dr. Guo was prescribing Ambien to Plaintiff as well. (Tr. 689).

On May 30, 2013, Plaintiff was treated by Dr. Guo for insomnia. (Tr. 686). Plaintiff reported taking two hours per night to fall asleep and waking five times per night. (*Id.*). Dr. Guo noted that Plaintiff's psychiatrist had changed her from sertraline to Remeron, and increased her valium dose. (*Id.*). Dr. Guo assessed her with improved anxiety and insomnia. (Tr. 689).

On July 31, 2013, Plaintiff was treated by Dr. Remington and reported changes in her medications. (Tr. 710). She left "appearing logical[] and rational." (*Id.*).

On October 7, 2013, Plaintiff saw Dr. Jacobson again.   (Tr. 756).   Plaintiff reported finding it difficult to motivate herself against her back pain, panic, depression, and anxiety.  (*Id.*).  Physical exam revealed: 9/10 pain; moderate distress; anxious, sad, and pained affect; slowed, negative, and somatic associations; decreased rate and tone of speech; decreased psychomotor activity; depressed mood with decreased energy, interest, functioning, concentration, and sleep; fair judgment; and fair insight.  (*Id.*).  Dr. Jacobson diagnosed her with: major depressive disorder; chronic back pain; pain disorder; panic disorder with agoraphobia; generalized anxiety disorder; insomnia secondary to pain and depression; scoliosis; chronic neck pain; migraine headaches; osteoporosis; chronic lower back pain; sciatic pain; and sickle cell trait.  (Tr. 757).  He prescribed mirtazapine and told Plaintiff to stop taking diazepam and alprazolam.  (*Id.*).

### 3.     Migraine Headache Treatment After Alleged Onset Date

Plaintiff's records also show treatment for physical pain as well as her mental health issues, including repeated treatment for migraine headaches.  Plaintiff saw Roopa Korni, M.D., on April 16, 2012, complaining of migraines and back pain. (Tr. 492).  She was diagnosed with migraines and chronic back pain, and referred to Rochester Pain Management Group for management of her back pain.[4]  (Tr. 494).

On April 18, 2012, Plaintiff reported to Jebin Chacko, M.D., at the Rochester General Hospital neurology clinic for a consultative evaluation at Dr. Korni's request. (Tr. 501).  Dr. Chacko noted that Plaintiff's migraines had an average severity of 9/10,

---

[4]     *See* Part II(D)(4) of this Decision and Order for discussion of treatment for lower back pain.

occurred 1-3 times per week, and lasted for a couple of hours at minimum but could last the whole day. (*Id.*). Plaintiff stated that Imitrex was helpful in reducing migraine symptoms when taken soon after a migraine's onset. (*Id.*). Dr. Chacko prescribed Imitrex and nortriptyline. (Tr. 502).

On May 15, 2012, Plaintiff had a follow up visit with Dr. Chacko. (Tr. 503). Plaintiff's migraines did not improve with nortriptyline and Dr. Chacko recommended she cease taking it. (*Id.*). Dr. Chacko prescribed propranolol, and suggested Plaintiff continue using Imitrex. (*Id.*).

On June 26, 2012, Plaintiff was treated by Matthew Fleig, M.D., at the University of Rochester Medical Center for anxiety, lumbago, and migraines. (Tr. 505-06). She reported no improvement with sertraline (Zoloft). (Tr. 505). Plaintiff noted Imitrex helped only if it was administered early in the course of the headache. (*Id.*). Plaintiff was assessed with anxiety, lumbago, and migraines. (Tr. 506). Plaintiff was prescribed sertraline, diclofenac, promethazine and Imitrex. (Tr. 506).

### 4.   Lower Back Pain Treatment after Alleged Onset Date

Plaintiff's records show a history of lower back and abdominal pain stemming from an unknown cause. Plaintiff was admitted to Rochester General Hospital from March 1, 2012 to March 3, 2012, for lower abdominal pain and right-sided back pain with dysuria, nausea, and vomiting. (Tr. 581, 596). She was treated for abdominal pain, and diagnosed with with nephrolithiasis, cholelithiasis, pyelonephritis, and gastritis. (Tr. 598). Plaintiff was treated again at the Rochester General Hospital emergency

- 14 -

department on April 5, 2012, for left sided flank pain and low back pain, and on May 11, 2012, for lumbar and thoracic pain. (Tr. 605, 611).

On May 19, 2012, Plaintiff reported to Dr. Hadian, at Rochester Pain Management for bilateral leg pain and lower back pain. (Tr. 543-44). Plaintiff stated that a car accident during her pregnancy had caused the pain, but that she did not seek treatment until after the birth of her child.[5] (Tr. 543). Plaintiff reported her current pain severity was 7/10, average severity was 9/10, and her least severe pain was 5/10. (*Id.*). Physical exam revealed: tenderness to palpation of her upper lumbar region; positive lumbar facet maneuver; limited lumbar flexion; and multiple trigger points in the upper and lower lumbar region. (Tr. 544). Dr. Hadian also noted Plaintiff had a normal gait, and was able to complete a heal-to-toe walk. (*Id.*). Plaintiff was diagnosed with "unspecified myalgia and myositis," and "lumbosacral spondylosis without myelopathy." (*Id.*). Dr. Hadian observed that Plaintiff had tried physical therapy, with no result, and that her pain was not adequately controlled by medication. (*Id.*). He recommended diagnostic/therapeutic injections, warm compresses, and stretching exercises. (*Id.*). On May 22, 2012, Dr. Hadian performed bilateral L1, L2, and L3 medial branch blocks without complication. (Tr. 546-47). The next day, Plaintiff reported a thirty percent overall improvement in her pain, but that there was also shooting pain in her lower back that worsened after the treatment. (Tr. 548).

---

[5]     The record is unclear as to whether there was, in fact, a motor vehicle collision, or the cause of the back pain. The medical evidence from the May 11, 2012 Rochester General Hospital emergency department visit notes that Plaintiff's back pain was not associated with any known injury. (Tr. 611).

That same day, Dr. Houpt treated Plaintiff for chronic worsening back pain. (Tr. 495). Her pain was in the middle and lower back, radiating to her left thigh and right thigh. (*Id.*). Her symptoms were aggravated by bending, changing positions, extension, flexion jumping and twisting. (*Id.*). Dr. Houpt ordered a magnetic resonance imaging scan ("MRI") even though Plaintiff "[did not] appear to be in that much pain." (Tr. 498). Plaintiff was told to continue taking Flexeril and diclofenac. (*Id.*).

On June 9, 2012, an MRI of Plaintiff's lumbar spine revealed minimal annular bulge at the L3-4 and L4-5 levels without spinal stenosis. (Tr. 511). At L4-5 there was mild facet arthropathy. (*Id.*). Plaintiff also had an MRI on her thoracic spine that showed "light prominence to the central canal posterior to the C7 vertebral body." (Tr. 509).

On June 11, 2012, Dr. Houpt wrote Plaintiff to inform her that there was "no disc herniation, spinal canal stenosis (narrowing), or any nerve impingement observed" in the MRI results. (Tr. 638). Dr. Houpt suggested that no surgical intervention would be helpful, and that Plaintiff follow up with pain management. (*Id.*).

On November 5, 2012, Plaintiff saw Dr. Hadian and complained of intense lower back pain that interfered with her sleep and level of functioning. (Tr. 712). A physical exam revealed: highly positive lumbar facet maneuver and provocative tests; paravertebral tenderness; and triggers in her paravertebral region that tended to be more tender in her lower lumbar region. (Tr. 712). Dr. Hadian planned to administer further bilateral medial branch blocks, and would consider using radiofrequency therapy. (Tr. 713).

On December 3, 2012, Plaintiff returned to Dr. Hadian for pain in her upper lumbar and lower thoracic regions. (Tr. 714). Plaintiff showed tenderness in her thoracic and lumbar spine, and exhibited normal gait. (*Id.*). Plaintiff postponed the recommended additional medial branch block due to a perceived conflict with Plaintiff's new job. (*Id.*). Plaintiff was told to continue using Flexeril and Percocet. (*Id.*).

Plaintiff again returned to Dr. Hadian on December 18, 2012, complaining that she could no longer tolerate her back pain without additional treatment. (Tr. 716). Plaintiff continued to have "very tender trigger points" in her paravertebral muscles and L2/L3 and L3/L4 region. (Tr. 716). Dr. Hadian performed trigger point injections to provide some pain relief "until [Plaintiff] is ready for treatment of her lumbar facets." (Tr. 716).

On January 4, 2013, Plaintiff followed up with Dr. Hadian. (Tr. 718). The trigger point injections had provided "significant" pain relief. (*Id.*). Plaintiff had tenderness in the paravertebral region, a stooped posture, and a normal gait. (*Id.*). Plaintiff was to continue taking Percocet and Flexeril. (Tr. 718-19).

On January 31, 2013, Plaintiff reported to Dr. Hadian for another evaluation of her lower back pain. (Tr. 720). Plaintiff stated that the current pain medications helped provide relief at an acceptable level. (*Id.*). A physical examination showed similar signs as previous examinations, and Plaintiff was to continue using Percocet and Flexeril. (*Id.*). On February 12, 2013, Dr. Hadian performed bilateral L1, L2, and L3 medial branch blocks without complications. (Tr. 722-23).

On March 1, 2013 Plaintiff saw Dr. Houpt for sharp and stabbing pain in her middle and lower back that radiated to her thighs. (Tr. 669). Plaintiff reported she

normally received Percocet from "pain management," but was unable to secure an appointment, so Dr. Houpt prescribed a short course of Percocet until Plaintiff could be seen by Dr. Hadian. (Tr. 671).

On March 8, 2013, Plaintiff saw Dr. Hadian for lower back pain that had returned after her medial branch block injections. (Tr. 724). Physical exam revealed positive lumbar facets provocative tests in her upper lumbar region and continued tenderness in her paravertebral region. (Tr. 724). She was assessed with myalgia, myositis, and lumbosacral spondylosis. (Tr. 724). Dr. Hadian noted that Plaintiff exhibited no drug-seeking behavior, and that her urine toxicology did not contain any abnormalities. (*Id.*). On March 27, 2013, Dr. Hadian performed a radiofrequency ablation of Plaintiff's left lumbar L1, L2, and L3 medial branch facet nerves without complication. (Tr. 726).

On April 8, 2013, Plaintiff treated with Dr. Hadian for lower back pain. (Tr. 728). Dr. Hadian again noted that Plaintiff did not exhibit any drug-seeking behavior. (*Id.*). Physical exam revealed positive lumbar facets provocative tests at her upper lumbar region and tenderness in the paravertebral region. (*Id.*). Dr. Hadian assessed her with myalgia, myositis, and lumbosacral spondylosis, and treated with continued medication. (Tr. 728-29). Dr. Hadian planned additional radiofrequency ablation treatments. (Tr. 729).

On April 26, 2013, Plaintiff followed up with Dr. Hadian for evaluation of her lower back pain and reported more pain on her right side, in her lower lumbar region, and over her right gluteal region. (Tr. 730). Plaintiff stated that her pain was reduced by taking medication. (*Id.*). Plaintiff's dosage of Flexeril was increased. (Tr. 731).

Plaintiff's recent urine toxicology showed findings consistent with what had been prescribed. (Tr. 730). Dr. Hadian noted his plan was to wean Plaintiff off opioids. (Tr. 731).

On May 24, 2013, Plaintiff saw Dr. Hadian for lower back pain and poor posture. (Tr. 732). Physical exam revealed: more muscle spasms on the left side of her back than her right; tenderness to palpation of the middle spine; and poor posture while sitting. (*Id.*). Medication was continued and Plaintiff was prescribed a Flector pain-relieving patch. (Tr. 732-33).

On July 15, 2013, Plaintiff reported to Dr. Hadian that the patch had not relieved pain. (Tr. 735). Physical exam revealed "marked tenderness at her T10, T11, and T12 vertebrae," and tenderness at Plaintiff's L1 and L2 vertebrae. (*Id.*). Dr. Hadian assessed unspecified myalgia and myositis, and lumbosacral spondylosis without myelopathy. (*Id.*). Medications were continued, and Dr. Hadian recommended Plaintiff undergo x-rays of the thoracic and lumbar regions. (Tr. 731).

As noted above, on October 7, 2013, Plaintiff met with Dr. Jacobson, primarily in connection with her mental health issues. (*See* Tr. 756). Dr. Jacobson noted that Plaintiff felt her pain was not being adequately managed by the medications prescribed by Dr. Hadian. (*Id.*).

On October 8, 2013, Plaintiff went to Rochester General Hospital emergency department for leg and lower back pain which she described as "stabbing pins and needles." (Tr. 767). Physical exam revealed tenderness in her thoracic region and tenderness in her lumbar region out of proportion to light palpation. (Tr. 769). Plaintiff

was treated with a single Toradol shot. (*Id.*). Plaintiff was informed there was "not much [the emergency department] could do" because the exam was "benign" and Plaintiff was already a patient at a pain management clinic. (*Id.*).

On October 9, 2013, Plaintiff saw Dr. Hadian for an acute exacerbation of her lower back pain. (Tr. 758). Dr. Hadian noted that he prescribed a month's supply of oxycodone, but, due to exacerbated pain, Plaintiff consumed the prescription ahead of schedule. (*Id.*). Physical exam revealed: marked tenderness in the upper and mid lumbar regions; bilateral pain with greater pain on the left side of her back; painful lumbar facet maneuver; and significant muscle spasm in the paravertebral region. (Tr. 758-59). She was assessed with myalgia, myositis, and lumbar spondylosis and was prescribed Percocet. (Tr. 759). Dr. Hadian noted "because of the intensity of her pain she has not been able to function at work." (*Id.*).

On October 11, 2013, Dr. Hadian performed bilateral L2, L3, and L4 medial branch blocks without complications. (Tr. 762-63).

## 5.    Treating Provider Statements

On October 26, 2012, Kim Linde, M.S., completed a Mental Residual Functional Capacity Questionnaire regarding Plaintiff. (Tr. 625-630). Linde opined that Plaintiff reported significant symptoms of depression and expressed a concern that she might have been having auditory and visual hallucinations. (*Id.*).

Linde listed Plaintiff's symptoms as: anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; blunt, flat, or inappropriate affect; feelings of guilt or worthlessness; impairment in impulse

control; generalized persistent anxiety; somatization unexplained by organic disturbance; mood disturbance; difficulty thinking or concentrating; psychomotor agitation or retardation; persistent disturbances of mood or affect; apprehensive expectation; paranoid thinking or inappropriate expectation; emotional withdrawal or isolation; intense and unstable interpersonal relationships and impulsive and damaging behavior; perceptual or thinking disturbances; hallucinations or delusions; emotional lability; deeply ingrained, maladaptive patterns of behavior; autonomic hyperactivity; and sleep disturbance. (Tr. 626).

Linde assessed Plaintiff as being unable to meet competitive standards in her ability to accept instructions and respond appropriately to criticism from coworkers. (Tr. 627). She opined Plaintiff had a seriously limited ability to: maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; and deal with normal work stress. (*Id.*). These opinions were based on Plaintiff's self-report. (*Id.*). Linde did not include any medical or clinical findings supporting the assessment. (*Id.*). Linde also opined Plaintiff was seriously limited in her ability to: understand and remember detailed instructions; carry out detailed instructions; deal with stress of semiskilled and skilled work; and interact appropriately with the general public. (Tr. 628).

- 21 -

Linde stated Plaintiff's impairments or treatment would cause her to be absent from work for about 2-3 days per month, and her impairment has lasted or can be expected to last at least 12 months. (Tr. 629). She opined Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in her evaluation, and that Plaintiff was non-compliant with her medication. (*Id.*). In Linde's opinion, Plaintiff could not engage in full time competitive employment on a sustained basis. (Tr. 630).

Frederick B. Remington, M.D., provided a letter dated September 11, 2013 concerning Plaintiff's condition. (Tr. 701). Dr. Remington indicated Plaintiff had been diagnosed with generalized anxiety disorder, panic disorder without agoraphobia, and paranoid personality disorder. (*Id.*). She was being treated with Xanax and Valium, and was compliant with therapy and medications. (*Id.*). Dr. Remington stated that, in his view, Plaintiff "must be put on short term disability." (*Id.*).

### 6.    State Agency Opinions

A. Hochberg, a psychologist, conducted a Psychiatric Review Technique of Plaintiff at the behest of the Social Security Administration on December 8, 2011 and concluded there was insufficient evidence to make an impairment determination in her case. (Tr. 303-16).

On September 24, 2012, Kavitha Finnity, Ph.D., conducted a consultative psychiatric evaluation at the behest of the Social Security Administration. (Tr. 512-19). This was Plaintiff's fourth scheduled examination; Plaintiff failed to attend three prior scheduled examinations for unknown reasons. (*See* Tr. 223, 317). Dr. Finnity noted that

Plaintiff was irritable and agitated, and refused to complete certain tasks. (Tr. 513). Dr. Finnity opined Plaintiff was able to follow and understand simple directions, but unable to maintain a regular schedule, relate with others, and appropriately deal with stress. (Tr. 514). Dr. Finnity diagnosed her with major depressive disorder, panic disorder, and migraines. (*Id.*). She specifically opined Plaintiff would have moderate impairments in her abilities to: interact appropriately with the public; interact appropriately with supervisors; interact appropriately with coworkers; and respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 517).

## III.   The Commissioner's Decision Regarding Disability

### A.   Determining Disability Under the Social Security Act

For both Social Security Insurance and Disability Insurance Benefits, the Social Security Act provides that a claimant will be deemed disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see Rembert v. Colvin*, No. 13-CV-638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). The burden is on the claimant to demonstrate that he is disabled within the meaning of the Act. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002). The individual will only be declared disabled if his impairment is of such severity that he is unable to do his previous

work and cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination of disability at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). The five steps are as follows:

1.    The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.    If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.    If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.    If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.    If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

**B. Summary of the ALJ's Decision**

In applying the five-step sequential evaluation in this matter, ALJ Chin made the following determinations. First, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act. (Tr. 17). At step one of the evaluation, the ALJ

found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date, January 1, 2011. (*Id.*). Plaintiff did work 37.5 hours per week for AIDS Care of Rochester from October 2012 until May 2013, but ALJ Chin assumed that this work did not constitute "substantial gainful activity" for purposes of the sequential analysis. (*Id.*).

At step two, the ALJ found that Plaintiff suffered from severe impairments, including "anxiety disorders, affective disorders, a personality disorder, disorders of her thoracic and lumbar spine, migraines, and insomnia" which limit her ability to do basic activities. (Tr. 18). The ALJ found that Plaintiff also suffered from non-severe impairments. (*Id.*). In his discussion of Plaintiff's non-severe impairments, ALJ Chin stated that Plaintiff "has an opioid addiction." (*Id.*). He also noted that the records do not show that medical staff had ever observed Plaintiff to be intoxicated, nor did the addiction "impose[] a significant mental or physical restriction" on Plaintiff's work. (*Id.*). ALJ Chin also asserted that the scoliosis claimed by Plaintiff in her testimony was not reflected in the medical records sufficient to show the existence of the impairment. (*Id.*). He therefore found that scoliosis was not a medically determinable impairment. (*Id.*). At step three, the ALJ found that none of Plaintiff's severe impairments, alone or in combination, qualified as an impairment listed in Appendix 1. (*Id.*). Plaintiff did not claim to meet the severity of a listed impairment, and did not present evidence to support such a finding. (Tr. 18-19).

Because Plaintiff's severe impairments failed to meet the standards of a listing under Appendix 1, ALJ Chin assessed Plaintiff's Residual Functional Capacity ("RFC") in step four of the sequential analysis. (Tr. 20-25). The ALJ found that Plaintiff:

[H]as the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that she can lift no more than 50 pounds occasionally and 25 pounds frequently; stand and walk for about 6 hours; and sit for up to 6 hours in an eight-hour workday with normal breaks. She is limited to occasionally climbing ladders, ropes and scaffolds and frequently climbing ramps or stairs. [Plaintiff] can perform frequent balancing, stooping, kneeling, crouching, and crawling. She is limited to simple, routine, repetitive tasks performed in a work environment free from fast-paced production requirements involving only simple work related decisions and routing workplace changes. Last, [Plaintiff's] work must be isolated from the public with only occasional supervision and interaction with coworkers.

(Tr. 20).  In making his RFC determination, the ALJ followed a two-step process. First, the ALJ "determined whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce [Plaintiff's] pain or other symptoms." (*Id.*).  Then the ALJ assessed the intensity, persistence, and limiting effects of Plaintiff's symptoms, and made findings of credibility "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence." (*Id.*).

At RFC step one, ALJ Chin found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 21). However, at RFC step two, he found that the statements regarding the intensity, persistence, and limiting effects of Plaintiff's symptoms were not credible. (*Id.*).

ALJ Chin took issue with Plaintiff's perceived lack of candor with the Social Security Administration and her treating providers. (*Id.*).  The ALJ pointed to Plaintiff's testimony regarding her history of drug abuse. (*Id.*).  Plaintiff testified at the hearing that she did not have a history of drug abuse. (Tr. 40-41).  The ALJ found this inconsistent

with Plaintiff's treatment with Suboxone—itself indicative of addiction to opioids—both before and after her alleged onset date. (Tr. 21). Plaintiff's testimony about her history of drug abuse was further impeached by Dr. Hurley's treatment notes which state Plaintiff was not honest about the medications she had been prescribed by other providers, and had failed drug screening tests. (*Id.*). ALJ Chin noted such dishonesty with Dr. Hurley was "not an isolated incident." (*Id.*). Plaintiff's records showed that she was receiving prescriptions from multiple providers, and the prescribing physicians were unaware of each other's treatment of Plaintiff. (Tr. 21-22). The ALJ also pointed to Plaintiff's request that her pharmacy not inform Dr. Guo of a prescription from another provider. (Tr. 22, 682).

Because of these stated deficiencies, the ALJ "largely relied upon [Plaintiff's] objective medical evidence . . . ." (Tr. 22). The ALJ found Plaintiff's mental health treatment, though extensive, was "conservative, and . . . not consistent since her alleged onset date due to her failure to keep appointments and failure to take her medication regularly." (*Id.*). The ALJ further discounted Plaintiff's testimony regarding her medications' lack of effectiveness because she had made contrary statements to her doctors. (*Id.*). ALJ Chin also noted that Plaintiff did not require any in-patient treatment or frequent out-patient therapy. (*Id.*).

ALJ Chin considered the opinion evidence of medical experts when assessing the mental health portion of Plaintiff's RFC. (Tr. 23-25). First, he gave moderate weight to Dr. Finnity's evaluation. (Tr. 23). The ALJ found that Dr. Finnity's assessment that Plaintiff "would have difficulty maintaining a schedule appears [sic] is not supported by

her examination findings." (*Id.*). The ALJ pointed to Plaintiff's consistent attendance at regular appointments with her pain management specialist. (*Id.*). This, according to the ALJ, contradicted Dr. Finnity's opinion that Plaintiff could not maintain a normal work schedule. (*Id.*).

ALJ Chin also gave moderate weight to Linde's opinion. (Tr. 23-24). The ALJ noted that Linde "is not an acceptable medical source." (Tr. 24). The ALJ also took issue with Linde's assessment because of her "limited" familiarity and professional-treatment relationship with Plaintiff. (Tr. 24).

Similarly, ALJ Chin gave Dr. Jacobsen's opinion very little weight due to his limited treatment of Plaintiff. (*Id.*). Though Dr. Jacobsen treated Plaintiff consistently in 2009 and 2010, there were large gaps in his treatment of Plaintiff after 2010. (*Id.*). Dr. Jacobsen's assessment also failed to include a function-by-function analysis, relying, instead, on conclusory statements. (Tr. 24).

Finally, ALJ Chin gave Dr. Remington's opinion very little weight due to Dr. Remington's limited treatment of Plaintiff. (Tr. 24-25). Like Dr. Jacobsen, Dr. Remington saw Plaintiff consistently in 2009 and 2010, but inconsistently thereafter. (Tr. 24). The ALJ viewed the medical opinion provided by Dr. Remington as inconsistent with his own treatment notes. (*Id.*).

The ALJ also discounted the intensity of Plaintiff's back pain. (*See* Tr. 22-25). The ALJ noted that though there had been some mild findings from Plaintiff's two MRIs, neither MRI conclusively showed the origin of her pain. (Tr. 23). ALJ Chin pointed to

treating physicians' assessments that Plaintiff's gait was normal, and that she had frequent 'normal' findings regarding motor strength, reflexes, and extremities. (*Id.*).

In sum, the ALJ found that the objective medical evidence failed to substantiate Plaintiff's claimed severe impairments at a disabling level. (Tr. 25). Regarding her physical impairment, ALJ Chin stated:

> I find that [Plaintiff's] mental disorders discussed herein—and not her physical impairments—cause her the most difficulty. While I do not doubt that [Plaintiff] has physical limitations, as reflected in her residual functional capacity, when I consider the full picture before me, I conclude that her physical disorders do not present the most significant obstacles to her basic work abilities. Although [Plaintiff's] musculoskeletal disorders likely reduce her ability to lift heavy objects, the totality of the record does not indicate that she could not perform the standing, walking, lifting, and carrying requirements of medium work.

(*Id.*). Plaintiff's mental health disorders presented a significant limitation on her ability to work. (*Id.*). ALJ Chin stated that the RFC reflected Plaintiff's significant mental limitations by restricting her work to "simple repetitive tasks performed in a low-stress work environment with low social demands." (*Id.*).

At step five of the sequential analysis, the ALJ found, based on the vocational expert's testimony, that there were jobs that exist in significant numbers in the local and national economies for a person with Plaintiff's qualifications and limitations. (Tr. 25-26). Though the mental demands of Plaintiff's past work exceeded her RFC, she could find work as a hand packager or assembler. (Tr. 26). The ALJ concluded that Plaintiff was not disabled for purposes of §§ 216(i), 223(d), or 1614(a)(3)(A) of the Social Security Act. (Tr. 27).

## IV.   Discussion

### A.   Standard of Review

This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3).   "In reviewing a decision of the Commissioner, a court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.'" *Rehr v. Barnhart*, 431 F. Supp. 2d 312, 317 (E.D.N.Y. 2006) (quoting 42 U.S.C. § 405(g)).   The Social Security Act directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record.   42 U.S.C. § 405(g).   Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Pearles*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating Plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence on the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (stating that a

reviewing Court does not examine a benefits case *de novo*). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Judgment on the pleadings may be granted under Rule 12(c) where the "material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *See Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).

> **B.      The ALJ's RFC Determination Regarding Physical Limitations is Not Supported by Substantial Evidence**

Plaintiff makes only one argument in this case—namely, that the ALJ's RFC findings with respect to Plaintiff's physical limitations are not supported by substantial evidence. (Dkt. 11-1 at 22-27). In particular, Plaintiff contends that there was no medical opinion evidence to support the conclusion that Plaintiff could perform medium work, and that the ALJ "personally interpreted the physical medical evidence in making this finding . . . ." (*Id.* at 22-23).

Plaintiff's claims are well-founded. Social Security Administration rules state that a claimant's medical reports should include a statement from her treating physician detailing the claimant's capacity for work despite her limitations. 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6). The lack of such a statement, however, does not render the claimant's medical history incomplete. 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6). Indeed, the Commissioner's decision will not be remanded because of an

ALJ's failure to obtain a medical source statement where "the record contains sufficient evidence from which an ALJ can assess the petitioner's [RFC]." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013); *see, e.g.*, *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (noting that an ALJ is under no obligation to seek additional information where a claimant's medical records are complete). However, there must actually be sufficient evidence in the record upon which the ALJ can base her RFC. The ALJ is under an affirmative obligation to "fill any clear gaps in the administrative record," even where the claimant is represented by counsel. *Rosa*, 168 F.3d at 79. An ALJ's decision is not supported by substantial evidence when the ALJ failed to fully develop the record. *Tejada v. Apfel*, 1667 F.3d 770, 774-76 (2d Cir. 1999); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996).

Here, there is a clear gap in the administrative record that the ALJ failed to correct. The extensive records regarding Plaintiff's physical ailments do not include any description or evaluation by Plaintiff's treating physicians regarding her physical capacity to work. *Cf. Tankisi*, 521 F. App'x at 34 (describing the medical records as including "an assessment of [the plaintiff's] limitations from a treating physician"). Each of the four medical opinions provided to the ALJ assessed Plaintiff's mental capacity for work. (*See* Tr. 23-25). The Commissioner does not argue that the record includes a medical practitioner's evaluation of the Plaintiff's physical capacity to work. (*See* Dkt. 13 at 15-19). The Commissioner only asserts, in a conclusory fashion, that "the record is fully developed," and points to Plaintiff's failure to raise this issue at her hearing. (*Id.* at 18-

19).  But it is the ALJ's responsibility, not Plaintiff's, to make sure that the record is complete.  The ALJ failed to do so.

The Commissioner also asserts that because the ALJ's decision was based on objective medical evidence present in the record, the absence of a medical practitioner's interpretation of Plaintiff's physical work capacity was immaterial.  (Dkt. 13 at 15-19).  This is the case, according to the Commissioner, because the ALJ is entitled to rely on his "common sense judgment" in evaluating Plaintiff's medical records.  (*Id.* at 15-17).

Common sense judgement surely plays a role in the ALJ's decisionmaking process, but the ALJ was not entitled, as a non-expert, to interpret the voluminous evidence of Plaintiff's physical impairments using his own common sense.  *See Rosa*, 168 F.3d at 79 (asserting that the ALJ "as a lay person" was "simply not in a position" to interpret the medical evidence).  The Commissioner points to *Skuipen v. Colvin*, No. 13-CV-403S, 2014 WL 3533425 (W.D.N.Y. July 11, 2014) to support the assertion that the ALJ can use his common sense in deciding Plaintiff's RFC.  (Dkt. 13 at 15).  Reliance on *Skuipen* is misplaced.  The *Skuipen* court stated that "[o]ur district also has recognized that 'where the medical evidence shows *relatively little physical impairment*, an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment.'"  *Skuipen*, 2014 WL 3533425, at *4 (emphasis added) (quoting *Walzer v. Chater*, No 93 Civ. 6240, 1995 WL 791963 (S.D.N.Y. Aug. 17, 1995)).

The ALJ's decision's language illuminates the ALJ's reliance on his own judgment of the medical evidence.  (Tr. 25).  He stated: "[W]hen I consider the full

picture before me, I conclude that [Plaintiff's] physical disorders do not present the most significant obstacles to her basic work abilities." (*Id.*). The ALJ's decision includes only one paragraph discussing Plaintiff's back pain, in which he points out that "[d]espite benign imaging reports" Plaintiff was prescribed narcotics, injections, and radiofrequency ablation for her back pain. (Tr. 23). The decision does not explicitly discount the validity of any of Plaintiff's medical providers' progress notes or impressions, as it does for Plaintiff's medical source statements. (*See* Tr. 20-25).

Here, as in *Skuipen*, the administrative record shows significant evidence of physical impairment. The plaintiff in *Skuipen*, like Plaintiff, provided medical records to the ALJ, including medical progress notes and test results relating to her physical ailments. *See Skuipen*, 2014 WL 3533425, at *4. Plaintiff in this case was seen by multiple physicians and pain specialists to deal with her migraine headaches and lower back pain. The medical records and notes of those visits are included in the administrative record. Plaintiff claimed, without contradiction, that she had been involved in a car accident in January 2011, which may have caused her back pain. And although objective testing did not show a clear medical cause of Plaintiff's lower back pain, medical experts observed abnormalities in Plaintiff's MRI scans.

The *Skuipen* court found that there was "no sound basis from which the ALJ could [make] a common sense judgment about functional capacity" because the treating physician records did not evidence the plaintiff's ability to perform work-related functions. *Id.* Here, similarly, there was no basis for the ALJ to rely on his common sense judgment in interpreting Plaintiff's raw medical records.

- 34 -

The Commissioner also argues that Plaintiff's failure to attend the first three scheduled consultative examinations disclaims the ALJ's requirement to fully develop the record with an additional consultative evaluation for Plaintiff's physical limitations. (Dkt. 13 at 19). It is true that a claimant's refusal to meet or cooperate with consultative examiners can be the basis for an ALJ's decision to deny benefits, 20 C.F.R. §§ 404.1518; 416.918; *see, e.g., McClean v. Astrue*, 650 F. Supp. 2d 223, 228 (E.D.N.Y. 2009), but the ALJ's decision does not mention the failure to attend the first three scheduled consultative examinations with Dr. Finnity, *see* Tr. 20-25. The ALJ does point out Plaintiff's failure to fully cooperate during the fourth scheduled mental health evaluation (which Plaintiff attended). (Tr. 23). However, this observation is not linked in any way to a refusal by the ALJ to order a physical consultative examination or medical source statement regarding Plaintiff's physical limitations. (*See* Tr. 20-25). Indeed, the ALJ did not mention the record's lack of a treating source statement or consultative evaluation of Plaintiff's physical limitations at all. (*See id.*)

The ALJ's failure to fully develop the record requires this Court to find that his decision is not supported by substantial evidence. *See Pratts*, 94 F.3d at 37.

## V.    CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt. 13) is denied, Plaintiff's motion for judgment on the pleadings (Dkt. 11) is granted in part, and this matter is remanded for further administrative proceedings consistent with this Decision and Order.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: September 13, 2016
Rochester, New York